## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ESTATE OF PAULA O'CONNOR,** *et al.,*

        **Plaintiffs,**

vs.                                                                  **Case No. 8:12-cv-02070-T-27MAP**

**UNITED STATES OF AMERICA,**

        **Defendant.**

_____/

### ORDER

**BEFORE THE COURT** are Defendant's Motion to Dismiss (Dkt. 20) the First Amended

Complaint for Wrongful Death Damages (Dkt. 16) and Plaintiffs' Request for Oral Argument

(Dkt. 28). Because Plaintiffs failed to file a timely administrative claim under the Federal Tort

Claims Act ("**FTCA**"), the Court lacks subject matter jurisdiction to consider Plaintiffs' claims.[1]

### Introduction

The First Amended Complaint alleges that certain "actions, inactions and/or omissions" by

the United States led to the murder of Paula O'Conner and her 14 month old son, Alijah O'Conner,

---

[1] Even absent the jurisdictional bar, Plaintiffs' claims would be subject to dismissal as a matter of law. Plaintiffs' claims are, at best, based on questionable legal theories and an overbroad interpretation of the waiver of sovereign immunity provided by the FTCA. *See, e.g., Mercado del Valle v. United States*, 856 F.2d 406 (1st Cir. 1998) (wrongful death suit arising out of hazing incident was barred because Air Force's supervision of an unrecognized R.O.T.C. program was discretionary function); *Attallah v. United States*, 955 F.2d 776 (1st Cir. 1992) (holding that customs agents were not acting within scope of their employment when they robbed and killed courier and that failure of their supervisors to follow proper procedure fell within discretionary function exception of the FTCA); *Carlyle v. United States Dep't of the Army*, 674 F.2d 554 (6th Cir. 1982) (passerby injured when recruits threw furniture out a window could not recover for negligent supervision because decision as to how to supervise new recruits awaiting enlistment was discretionary function); *see also Sheridan v. United States*, 487 U.S. 392 (1988) (noting that tortious conduct of off-duty serviceman, not acting within the scope of his office or employment, did not in itself give rise to government liability); *Bates v. United States*, 701 F.2d 737 (8th Cir. 1983) (military policeman's conduct in stopping automobile, handcuffing and killing male occupants of vehicle, assaulting, raping and ultimately shooting the young women in the vehicle did not arise out of and in the scope of his employment).

in July of 2007.[2]   The First Amended Complaint asserts claims against the United States for (1) direct negligence based on an independent duty to protect (Count I), (2) direct negligence based upon a good samaritan duty (Count II), (3) negligence under 28 U.S.C. § 2680(h) based on conduct of an investigative or law enforcement officer (Count III), (4) negligent hiring and supervision (Count IV), and (5) intentional infliction of emotional distress (Count V).[3]

The United States moves to dismiss the First Amended Complaint on the grounds that (1) the Court lacks subject matter jurisdiction because Plaintiffs' claims are time barred under 28 U.S.C. § 2401(b), (2) the United States cannot be held vicariously liable for a tort committed by an assailant who acted outside the scope of his employment, and (3) Plaintiffs' claims are excepted under the FTCA.  Plaintiffs respond by arguing that they filed a timely administrative claim and that they assert viable claims for relief under the FTCA and Florida law.

### Facts Relating to Substantive Claims: The Murders of Paula and Alijah O'Conner

On July 6, 2007, Paula O'Conner and her 14 month old son, Alijah O'Conner, were murdered by Alijah's father, Ralph Daniel Wright, Jr. ("**Wright**").  *See, e.g.*, First Amended Wrongful Death Complaint for Damages (Dkt. 16), ¶ 23.[4]  At the time of the murders, Wright was a reserve sergeant and law enforcement officer employed by the United States Air Force and stationed at MacDill Air Force Base in Tampa, Florida.  *See, e.g., id.* at ¶¶ 4, 22.d., 24.

---

[2] Plaintiffs spell the decedents' names "O'Connor" in the caption and body of the First Amended Complaint. Based on prior civil and criminal proceedings, as well as media sources, it appears that the proper spelling of the decedents' last name is "O'Conner."

[3] While Plaintiffs' original complaint asserted claims against Ralph Daniel Wright, Jr. and various John Does in addition to claims against the United States, those claims and Defendants were omitted from the First Amended Complaint.

[4] In February 2013, Wright was convicted for the murders by a jury in Pinellas County, Florida.

Paula O'Conner and Wright met on an unknown internet site approximately a year and a half before the murders. The couple engaged in a sexual relationship that resulted in the birth of Alijah O'Conner. *See, e.g., id.* at ¶ 22. Alijah O'Conner was born with various medical disabilities and deformities that resulted in substantial and continuing medical expenses. *Id.*

During the course of their relationship and thereafter, Wright continually deceived Paula O'Conner with respect to his martial status, his intentions towards Paula and Alijah, the nature of his work for the Air Force, and his whereabouts. *Id.* Plaintiffs allege: "For months, Sergeant Ralph Daniel Wright, Jr. ignored Paula O'Connor's [sic] calls and his purposeful unavailability to avoid Paula O'Connor [sic] was assisted by his co-workers including his commanding officer ... ." *Id.* at ¶ 22.j.

Wright refused to provide any financial or emotional support for Paula or Alijah O'Conner and ultimately cutoff all communication and denied paternity. As a result, Paula O'Conner filed a paternity lawsuit against Wright, placed a sign on Wright's lawn, and created a website entitled www.militarydeadbeatdads.com[5] in an effort to compel Wright to provide support for Alijah. *Id.*

---

[5] On the website www.militarydeadbeatdads.com (which was active and available to Plaintiffs at the time of the murders and remains active today), Paula O'Conner wrote in depth about her relationship with Wright and the lack of assistance from the military. For example, O'Conner wrote:

> [T]he Military apparently thinks this is a JOKE!! They have been of no help. I have written letters to Senators and they have been or [sic] no assistance to me. This man is getting away with leaving me hanging with a medically needy child with a heart condition and no support or medical coverage. This man should be charged criminally for what he has done.
>
> *****
>
> The Military's lack of response on this situation is beyond absurd. Meanwhile a man putting his uniform on his back and defending our Country's freedom is allowed to get a women pregnant and leave her and their son high and dry. I know there are other women out there that have a Military Dead Beat DAD! I hope this website will give them a way to get their story heard and to reach millions of people, so they know we have a growing epidemic in our own backyard, and the Government doesn't seem to give a damn.

Paula O'Conner also retained an attorney, John Tuthill, Esq.,to assist her with the paternity lawsuit and a private investigator in an attempt to locate Wright. Together, Paula O'Conner and Tuthill reached out to the Air Force on numerous occasions seeking the Air Force's assistance in connection with the paternity action. For the most part, it appears that the Air Force failed to respond to these requests for assistance.[6]

While Plaintiffs premise the liability of the United States on various legal theories, the crux of their argument is that the Air Force breached a legal duty to Paula and Alijah by assisting Wright with his deception and by failing to take appropriate steps to protect them despite allegedly having knowledge of Paula's O'Conner's relationship with Wright, Wright's deception, and Wright's dangerous propensities.[7]

---

[6] During Wright's criminal trial in January 2013, John Tuthill, Esq. testified that at the time of the murders he was aware of the Air Force's failure to respond to Paula O'Conner's requests for assistance and that following Paula O'Conner's death he assisted her daughter with matters relating to the estate. *See, e.g.*, Notice of Filing (Dkt. 27-2), Exhibit 2, pp. 12-15 , 75-79, 108-09, p. 137.

[7] The relationship between Paula and Alijah O'Conner and the government was much different than the relationships giving rise to a duty of care in the cases relied on by Plaintiffs. *See Bembenista v. United States*, 866 F.2d 493 (D.C. Cir. 1989) (army medical center owed duty to patient to protect her against foreseeable injurious acts of third persons); *Doe v. United States*, 838 F.2d 220 (7th Cir. 1988) (Air Force owed duty to children at base day care center to protect them from assault, even if persons committing assault were government employees); *Gess v. United States of America*, 952 F.Supp. 1529 (M.D. Ala. 1996) (Air Force hospital owed patients general duty of care to protect patients from criminal acts of third parties); *see also Block v. Neal*, 460 U.S. 289 (1983) (claim by borrower against Farmers Home Administration for defects in house resulting from government's failure to use due care in inspecting the house during construction did not fall within the misrepresentation exception to the FTCA). Similarly, any suggestion that the Air Force should have foreseen the risk that Wright would physically assault, let alone murder, Paula and Alijah O'Conner is tenuous, at best. *See Stone v. United States*, 373 F.3d 1129, 1132 (11th Cir. 2004) (United States owed no duty of care to civilian allegedly assaulted as a minor by three active duty naval personnel while visiting a naval barracks). For example, Plaintiffs do not allege that the Air Force was aware of any credible threats made by Wright toward Paula and Alijah O'Conner or that Wright had a history of violence or mental illness. *See Senger v. United States*, 103 F.3d 1437 (9th Cir. 1996) (evidence that Postal Service had actual or constructive knowledge of its employee's violent past conduct raised genuine issue of material fact precluding summary judgment on negligent hiring, negligent supervision, and negligent failure to warn claims brought by tow truck driver who was assaulted by a Postal Service employee as he was attempting to tow employee's car from post office parking lot); *see also Sheridan v. United States*, 487 U.S. 392 (1988) (claim against government for allowing off-duty serviceman who was armed and intoxicated to leave hospital with loaded rifle in his possession fell outside the intentional tort exception to the FTCA).

**Facts Relating to Subject Matter Jurisdiction:**
**Plaintiffs' Actual or Constructive Knowledge of**
**Facts  Relating to the Murders and the Air Force**[8]

The day after the murders, the Tampa Bay Times reported that police were investigating the deaths of Paula and Alijah O'Conner as homicides, that Wright was interviewed by police regarding the murders, and that Wright was a member of the military working at MacDill Air Force Base. *See* Motion to Dismiss (Dkt. 20-1), Exhibit 6.  The article also outlined Paula O'Conner's relationship with Wright, the pending paternity suit, Paula O'Conner's decision to hire an attorney and investigator to locate Wright, and described how Paula O'Conner had created the website www.militarydeadbeatdads.com to tell her story.  *Id.*  A similar article, without any reference to police interviewing Wright, ran in The Tampa Tribune on the same day.  *Id.*[9]

On October 23, 2007, a local television station reported that Wright was the primary focus of the police investigation and that police had ruled everyone else out as a possible suspect.  Motion

---

[8] "In resolving a factual attack [to subject matter jurisdiction], the district court may consider extrinsic evidence such as testimony and affidavits."  *Morrison v. Amway Corp.*, 323 F.3d 920, 924-25, n.5 (11th Cir. 2003) (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990)).  The newspaper articles, depositions, and related materials attached to the Motion to Dismiss are the proper subject of judicial notice under Rule 201, Federal Rules of Evidence, are self-authenticating under Rule 902, are otherwise admissible as either non-hearsay or as falling under an exception to the rule against hearsay, and are properly considered in evaluating the merits of the jurisdictional issue.  For example, newspapers and other periodicals are generally self-authenticating.  Fed. R. Evid. 902(6).  Moreover, the newspaper articles and other evidence cited by the Defendant are not offered for the truth of the matter asserted, but rather to show that Plaintiffs were on notice of facts relating to the murders and their possible connection to the government.  *See* Fed. R. Civ. P. 801(c); *see also cf. Macuba v. Deboer*, 193 F.3d 1316, (11th Cir.1999) (citations omitted) (noting that a court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form'").  In any event, Plaintiffs do not challenge the authenticity, reliability or admissibility of the evidence referenced by Defendant and, in fact, rely on similar testimony from other proceedings to support their position.

[9] Similar articles appeared in the Tampa Bay Times and The Tampa Tribune over the course of the next several days.  On July 10, 2007, the Tampa Bay Times reported that police had classified the deaths as homicides and had interviewed Wright.  *Id.*  On August 22, 2007, The Tampa Tribune reported that the autopsies of Paula and Alijah O'Conner determined that they died due to asphyxiation and again described Paula O'Conner's relationship with Wright.  *See* Motion to Dismiss (Dkt. 20-1), Exhibit 7.

to Dismiss (Dkt. 20-1), Exhibit 8.[10]  The report further noted that during the two days surrounding the murders Wright was AWOL from his job at MacDill Air Force Base. *Id.*  Also on October 23, 2007, an article in The Tampa Tribune reported that Wright was the "focus" of the police investigation and provided a detailed account of Paula O'Conner's relationship with Wright and the paternity suit. *Id.*  The Tampa Tribune article also highlighted Wright's unsatisfactory performance in his prior jobs with the Orange County Sheriff's Office and the Eatonville Police Department,[11] that Wright was assigned to guard duty at MacDill Air Force Base, and that Wright could drive law enforcement vehicles. *Id.*

On December 18, 2008, Wright was indicted for premeditated first degree murder in the deaths of Paula and Alijah O'Conner.  Motion to Dismiss (Dkt. 20-1), Exhibit 10.  The indictment was accompanied by an Affidavit of Probable Cause from a St. Petersburg Police Detective and an Investigator with the Florida State Attorney's Office.  Motion to Dismiss (Dkt. 20-2), Exhibit 12. The probable cause affidavit described in detail the investigation that led to the indictment as well as Paula O'Conner's relationship with Wright. *Id.*  The affidavit described Wright's financial motive for the murders and noted: "[T]he allegations in O'Conner's letters to the military and her website potentially threatened Defendant Wright's military career (adultery is a violation of the UCMJ) ... ." *Id.*

---

[10] While police indicated that they did not have enough evidence to make an arrest as of October 2007, they described Wright as uncooperative, "untruthful," and "unforthright." *Id.*

[11] Wright was terminated ("administrative-unfavorable") from his position with the Orange County Sheriff's Office for poor behavior and unsatisfactory performance.  Wright's employment with the Eatonville Police Department ended when he failed to complete mandatory retraining.  There is no evidence in the record that a history of violence or mental illness was the reason Wright was terminated from either position.

Newspaper articles appearing in the Tampa Bay Times and The Tampa Tribune on December 31, 2008, detailed Wright's arrest for the murders of Paula and Alijah O'Conner and recounted the events leading up to the murders, Wright's indictment, and Wright's arrest. *See* Motion to Dismiss (Dkt. 20-2), Exhibit 13.  On January 1, 2009, a similar article appeared in the Orlando Sentinel describing Wright's relationship with O'Conner and his unsatisfactory performance in his prior law enforcement jobs with the Orange County's Sheriff's Office and the Eatonville Police Department. *See* Motion to Dismiss (Dkt. 20-2), Exhibit 14. During January 2009, the circumstances surrounding the murders and Wright's arrest were again reported in various newspapers throughout the Tampa Bay Region. *Id.*

On June 25, 2009, Henry Hart, as the personal representative of the Estate of Paula O'Conner, filed a Motion for Final Judgment of Paternity, Child Support Arrearages, Medical Expenses of the Child and Attorney Fees and Costs in Pinellas County Circuit Court. *See* Motion to Dismiss (Dkt. 20-3), Exhibit 15.  The motion describes Paula O'Conner's relationship with Wright, her attempts to communicate with Wright through the American Red Cross, her creation of the website www.militarydeadbeatdads.com, and Wright's arrest and indictment for the murder of Paula and Alijah O'Conner. *Id.*

A deposition taken on May 13, 2010, as part of the criminal proceeding against Wright, reveals that ***prior to the murders*** Paula O'Conner's stepfather was aware of her relationship with Wright, Wright's employment at MacDill Air Force Base, the paternity suit, O'Conner's communications with representatives of MacDill Air Force Base, and the fact that O'Conner was scared of Wright. *See* Motion to Dismiss (Dkt. 20-3), Exhibit 16.  Similarly, the deposition of Paula O'Conner's daughter, Victoria Rose Goodin, reveals that she was aware of her mother's relationship

7

with Wright and *at the time of the murders* she suspected that Wright was responsible. *See* Motion to Dismiss (Dkt. 20-3), Exhibit 17.

Plaintiffs filed their Notice of Claim with the United States on August 8, 2011, more than four years after the murders and more than two years after Wright was indicted. *See* Motion to Dismiss (Dkt. 20-1), Exhibit 1. The United States denied Plaintiffs' claims on March 16, 2012. *See* Motion to Dismiss (Dkt. 20-1), Exhibit 5. Plaintiffs filed this action on September 13, 2012, within six months of the denial.

### Applicable Legal Standard

"Attacks on subject matter jurisdiction under Rule 12(b)(1) come in two forms, 'facial' and 'factual' attacks." *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n. 5 (11th Cir. 2003) (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990)). Facial attacks are based on the allegations in the complaint, which the court must take as true in deciding whether to grant the motion. *Morrison*, 323 F.3d at 925 n. 5. Factual attacks challenge subject matter jurisdiction "in fact, irrespective of the pleadings," and a court "may consider extrinsic evidence" in ruling on a factual challenge. *Id.* In such a case, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional issue." *Id.* at 925 (citation omitted).[12]

---

[12] A motion to dismiss for lack of subject matter jurisdiction is appropriate only "if the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action." *Id.* (citations omitted). When a jurisdictional challenge implicates the merits of plaintiff's claim, a court must "find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* (citations omitted). This ensures "a greater level of protection for the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) ... or Rule 56 ... both of which place great restrictions on the district court's discretion." *Id.* (citations omitted). In this case, the facts necessary to sustain jurisdiction do not implicate the merits of Plaintiffs' claims.

## Discussion

The United States asserts a *factual* attack on subject matter jurisdiction, arguing that Plaintiffs' claims are barred by the limitations period applicable to claims under the FTCA. *See* 28 U.S.C. § 2401(b).[13] While the United States is the party attacking the existence of jurisdiction, it is the Plaintiffs' burden to establish, "by a preponderance of the evidence, facts supporting the existence of federal jurisdiction." *Underwriters at Lloyd's, London v. Osting–Schwinn*, 613 F.3d 1079, 1085 (11th Cir. 2010); *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002).[14]

The United States is immune from suit unless it has consented to be sued. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). The FTCA waives the government's sovereign immunity, permitting individuals to sue the government "for injury or loss of property, or personal injury or

---

[13] In denying the United States' prior motion to dismiss which presented a *facial* attack on subject matter jurisdiction, this Court stated:

> Defendant's *facial* attack on subject-matter jurisdiction *vis a vis* the statute of limitations cannot be resolved from the face of the pleadings. ... Although the Court is not persuaded that (1) equitable tolling applies here, or that (2) Plaintiffs' allegations relating to their inability to discover the facts giving rise to their claims against the United States support the application of equitable estoppel against the United States, at this stage of the pleadings it is not "apparent on the face of the complaint" that Plaintiffs' claims are time barred by 28 U.S.C. § 2401. In short, when Plaintiffs' claims accrued cannot be determined from the face of the complaint. Accordingly, Defendant's *facial* attack on subject-matter jurisdiction cannot be resolved on its motion to dismiss. *See Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1237 (11th Cir. 2002) (noting that on facial attacks to subject-matter jurisdiction, plaintiff's allegations are entitled to presumption of truthfulness).

Order dated January 15, 2013 (Dkt. 15), pp. 2, 5 (emphasis added).

[14] Plaintiffs cite *Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990), for the proposition that noncompliance with the FTCA is an affirmative defense and suggest that it is the government's burden to submit admissible evidence demonstrating noncompliance. This ignores longstanding and controlling precedent in this Circuit holding that the timely filing of an administrative claim under the FTCA is a jurisdictional prerequisite and that it is a plaintiff's burden to demonstrate the existence of subject matter jurisdiction. *See, e.g., Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir. 1991); *Adkins v. United States*, 896 F.2d 1324, 1327 (11th Cir. 1990); *Tidd v. United States*, 786 F.2d 1565, 1567 (11th Cir. 1986); *Employees Welfare Committee v. Daws*, 599 F/2d 1375, 1378 n.6 (5th Cir. 1979). *But see Schmidt v. United States*, 933 F.2d 639, 640 (8th Cir. 1991).

death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). The FTCA, however, carefully circumscribes that waiver. One of the many constraints placed on it is a statute of limitations: "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within *two years* after such claim accrues ... ." 28 U.S.C. § 2401(b) (emphasis added). This limitation must be strictly construed. *See United States v. Kubrick*, 444 U.S. 111, 117-18 (1979) ("[I]n construing the statute of limitations, which is a condition of that waiver, we should not take it upon ourselves to extend the waiver beyond that which Congress intended."). The timely filing of a claim under 28 U.S.C. § 2401 is a prerequisite to federal court jurisdiction under the FTCA. *See Torjagbo v. United States*, 285 Fed. App'x 615, 617 (11th Cir. 2008); *Dalrymple v. United States*, 460 F.3d 1318, 1325-26 (11th Cir. 2006).[15]

Plaintiffs filed a Notice of Claim with the United States on August 8, 2011. Therefore, in order for their claim to have been timely filed under the FTCA their claims must have accrued no earlier than August 2009 and/or the statute of limitations must have been tolled for a period of time. Plaintiffs contend that their Notice of Claim was timely because their claims did not accrue until they learned of the direct connection between the government and the decedents' deaths and/or the applicable statute of limitations was tolled because the United States withheld information and misrepresented facts surrounding the murders of Paula and Alijah O'Conner.[16]

---

[15] When, as here, federal law expressly provides a limitations period, the applicable limitations period is governed by federal law. *See, e.g., Phillips v. United States*, 260 F.3d 1316, 1318 (11th Cir. 2001). The question of when a claim accrues for purposes of the FTCA is also a matter of federal law. *Id.* at 1318-19.

[16] In the alternative, Plaintiffs contend that due process and equal protection mandate that their claims did not accrue until the alleged assailant was convicted or acquitted of the murders. This argument is based on a misreading of *Heck v. Humphrey*, 512 U.S. 477 (1994), ignores the administrative purpose behind requiring a plaintiff to file a claim under the FTCA, and is contrary to precedent. *Cf. Skwira v. United States*, 344 F.3d 64, 82 n.17 (1st Cir. 2003) (noting

*Accrual of Action*

Under 28 U.S.C. § 2401(b), the limitations period generally begins to run when a plaintiff suffers injury. *See, e.g., Chamness v. United States*, 835 F.2d 1350, 1352 (11th Cir. 1988); *Price v. United States*, 775 F.2d 1491, 1493 (11th Cir. 1985). Under this traditional rule, Plaintiffs' injury would have accrued at the time Paula and Alijah O'Conner were murdered. *See Restatement (Second) of Torts* § 899 cmt. c (1979) ("A cause of action for death is complete when death occurs.").

In wrongful death actions under the FTCA, however, the delayed discovery rule may apply so that "a wrongful death claim accrues when the plaintiff knows, or exercising reasonable diligence should know, both of the decedent's death and its causal connection with the government." *Diaz v. United States*, 165 F.3d 1337, 1340 (11th Cir. 1999).[17] Thus, "the proper subject of knowledge for accrual purposes under the FTCA is (1) the fact of injury and (2) the injury's causal connection to the government." *Skwira v. United States*, 344 F.3d 64, 77 (1st Cir. 2003). "The standard set forth by the discovery rule is an objective one. In order for the state of limitations to be tolled pursuant to the discovery rule, the factual basis for the cause of action must have been 'inherently

_____

that if plaintiffs had submitted a timely notice of claim to the government, they could have asked the agency to hold the claim in abeyance pending the outcome of the criminal investigation – or, upon denial of the claim, filed a lawsuit in good faith, "on information and belief," and then ask the court to stay discovery pending the outcome of the ongoing investigation).

[17] The language in *Diaz* extending the delayed discovery rule to all wrongful death claims under the FTCA is *dicta* because *Diaz* itself was a medical malpractice case. As a result, there is some question whether the Eleventh Circuit has extended application of this "discovery" rule to all wrongful death claims under the FTCA. *See Auger v. United States*, 382 Fed. App'x 901, 902 (11th Cir. 2010) (citing *Diaz* and noting that the delayed discovery rule was limited to medical malpractice cases); *see also Ware v. United States*, 626 F.2d 1278, 1284 n.4 (5th Cir. 1980) ("Courts created the medical malpractice [discovery rule] to protect those who suffered damages arising out of both a specialized are, medicine, and a unique relationship, doctor-patient.").

unknowable' at the time of the injury." *Attallah v. United States*, 955 F.2d 776, 780 (1st Cir. 1992) (citing *Levin v. Berley*, 728 F.2d 551, 553 (1st Cir. 1984)).

Accrual of a wrongful death claim for purposes of the FTCA does not depend on a plaintiff knowing that the government was negligent; rather, the plaintiff need only have knowledge of an injury and its probable cause. *Kubrick*, 444 U.S. at 123. Definitive proof is not required to start the period for filing a claim under the FTCA. *Kronisch v. United States*, 150 F.3d 112, 123 n.6 (2d Cir. 1998). The accrual "period is not simply for the plaintiff to decide whether to sue after having collected all relevant evidence." *Chasteen v. United States*, 334 Fed. App'x 271, 273 (11th Cir. 2009).

"The pivotal question in each case [is] when, as a factual matter, sufficient information was available to the plaintiffs to reveal a connection between the [government] and the deaths." *Skwira*, 344 F.3d at 71 (quoting *Cutting v. United States*, 204 F.Supp.2d 216, 227-28 (D. Mass. 2002)). "Once a plaintiff knows or should know that he has been injured and who has inflicted the injury, '[t]here are others who can tell him if he has been wronged, and he need only ask.'" *Motley v. United* States 295 F.3d 820, 822 (8th Cir. 2002) (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979)); *see also Santiago-Ramirez v. Secretary of Dep't of Defense*, 984 F.2d 16, 19 (1st Cir. 1993) (noting that to file an administrative claim and preserve an individual's rights under the FTCA, one need only be in possession of "sufficient information for the agency to investigate the claims").

Assuming the delayed discovery rule applies to all wrongful death actions under the FTCA, the United States argues that Plaintiffs' claims accrued no later than June 25, 2009 (when the motion for final judgment in the paternity proceeding was filed), as Plaintiffs were aware, or in the exercise of reasonable diligence, should have been aware of every critical fact that would have triggered the

12

statute of limitations.[18] The Court agrees. In fact, it is arguable that Plaintiffs claims accrued no later than December 18, 2008, when Wright was indicted for the murders and the Affidavit of Probable Cause was filed.[19] On that date, the evidence of record reveals that Plaintiffs knew, or exercising reasonable diligence should have known, both of the decedent's death and its causal connection with the government. *See Attallah*, 955 F.2d at 780 (claim accrued at time custom agents were indicted for assault, robbery, and murder); *see also Skwira*, 344 F.3d at 81 (claim accrued two years prior to murder indictment of nurse when plaintiffs were aware of press reports concerning suspicious deaths at hospital, they were aware that government had begun a criminal investigation into decedent's death, and they knew that cause of death printed on death certificate was incorrect).[20]

While Plaintiffs assert in conclusory fashion that the United States "withheld the truth or misrepresented facts" for "7 to 8 years," Plaintiffs have failed to submit *any evidence* that suggests

---

[18] In the alternative, the United States contends that the Plaintiffs' claims accrued on July, 6, 2007, the date of the deaths of Paula and Alijah O'Conner, because the delayed discovery rule only applies to medical malpractice claims under the FTCA. The United States also argues that, even with the application of the discovery rule, Plaintiffs' claims accrued on July 6, 2007, because as of that date Plaintiffs were aware of both the injury and its connection with some act of the United States.

[19] Given the publicity surrounding the website www.militarydeadbeatdads.com and the information contained on that website, it is also arguable that Plaintiffs' claims accrued at the time of, or shortly after, the murders. Moreover, Plaintiffs clearly were on notice of the website as of the date the motion for final judgment was filed on behalf of the estate, given that the motion itself references the website. In any event, it is clear that Plaintiffs' claims accrued more than two years before they filed their administrative claim with the government.

[20] Similarly, Plaintiffs were, or should have been, aware of the facts giving rise to their negligent hiring claim no later than January 2009 (*i.e.*, after numerous newspapers reported on Wright's unsatisfactory employment history). To the extent that Plaintiffs assert multiple theories of recovery or causation (*e.g.*, negligent supervision vs. negligent hiring), the only relevant theory is the first one in time to establish the requisite causation. *See Callahan v. United States*, 426 F.3d 444, 452 (1ˢᵗ Cir. 2005).

they were misled by the government. Similarly, Plaintiffs in conclusory fashion, and without supporting evidence, assert that:

> the government did not inform the personal representative plaintiffs of its involvement directly as the testimony reveals [sic] of any investigation and it appears to have withheld facts revealed in its investigation, ignored fact [sic], protected its employee, knew Wright was an adulterer and in violation of military law and purposefully failed to act; lied to Plaintiff and/or Red Cross [sic] and other wrongdoing direct [sic] decedent, yet argue the Estate should have known of this conduct before admission.

Response to Motion to Dismiss (Dkt. 26), ¶ 19. Plaintiffs also suggest that "[a]fter the murders, the government should have confessed," but fail to allege what the government should have "confessed," let alone allege facts or present evidence demonstrating that the actions of the government prevented them from learning of the relationship, if any, between the government and the murders. *See Gonzalez-Bernal v. United States*, 907 F.2d 246, 250 (1st Cir. 1990) ("[T]he government is under no obligation to provide private citizens with information concerning ongoing criminal investigations.").

Plaintiffs' suggestion that they could not, with reasonable diligence, have known the actual causal connection between the government and the murders until the government purportedly "admitted" this connection during the criminal trial is not supported by the evidence and, in fact, is contradicted by the record. For example, the testimony of Paula O'Conner's daughter and stepfather reveals that at the time of the murders both suspected Wright was responsible. *See Kronisch v. United States*, 150 F.3d 112, 123 (2d Cir. 1998) (letters to government officials contending that plaintiff believed he was a victim of a CIA drug experiment evidenced knowledge sufficient to give rise to duty to investigate claim). Moreover, to the extent Plaintiffs claim that they were unaware

of the manner in which the Air Force handled Paula O'Conner's requests for assistance, the trial testimony of John Tuthill, Esq. demonstrates that Plaintiffs were on notice of these facts as of the date of murders (*i.e.*, John Tuthill, who assisted O'Conner's daughter – in her capacity as the personal representative of the estates of Alijah and Paula – with matters after her mother's passing, was directly involved with the requests for assistance and was aware of the Air Force's responses, or the lack thereof, prior to the murders). *See, e.g.*, Motion to Dismiss (Dkt. 20-1), Exhibit 9 (motion for substitution of party petitioner filed in paternity action); Notice of Filing (Dkt. 27-2), Exhibit 2 (transcript of Tuthill trial testimony), pp. 12-15 , 75-79 (discussing letters sent to military personnel requesting assistance by, or on behalf of, Paula O'Conner), pp. 108-09 (discussing Tuthill's retention as attorney for estates), p. 137 ("the U.S. military refused to confirm [Wright's] actual location").[21]

## *Equitable Tolling*

Plaintiffs also contend that the United States should be estopped from asserting the statute of limitations as a defense to this action under the theory of equitable estoppel or equitable tolling because the government engaged in fraud or deceit by withholding information from Plaintiffs. Plaintiffs further allege that the conduct of the United States and the Florida State Attorney's Office hindered their ability to investigate the circumstances surrounding the deaths of Alijah and Paula O'Conner.

---

[21] Tuthill's letters also demonstrate that as of June 19, 2006, he was aware that adultery was a violation of the Uniform Code of Military Justice. *See* Notice of Filing (Dkt. 27-2), Exhibit 2 (transcript of Tuthill trial testimony), p. 76. This fact was also contained in the Affidavit of Probable Cause filed on December 18, 2008.

Assuming that equitable tolling could apply to claims brought under the FTCA,[22] Plaintiffs have failed to satisfy their burden of showing exceptional circumstances warranting equitable tolling. *See Motley v. United* States 295 F.3d 820, 824 (8ᵗʰ Cir. 2002) ("equitable tolling should ... be used only in exceptional circumstances [and t]he party who is claiming the benefit of [the] exception ... bears the burden of showing that he is entitled to it") (internal citations and quotations omitted). Plaintiffs' conclusory allegations that their attempts to discover the facts giving rise to their claims were thwarted by the government fail to establish that they were prevented from timely filing their administrative claim because of extraordinary circumstances that were both beyond their control and unavoidable even with diligence. *See Arce v. Garcia*, 434 F.3d 1254, 1261 (11ᵗʰ Cir. 2006) (quoting *Sandvik v. United States*, 177 F.3d 1269, 1271 (11ᵗʰ Cir. 1999)). Moreover, even if the government had concealed facts relating to Plaintiffs' claims, such concealment did not continue to toll the statute of limitations after Plaintiffs became aware of the basic facts of their claims. *See Kronisch v. United States*, 150 F.3d 112, 123 n.6 (2d Cir. 1998) (citing *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995)).

---

[22] In support of their claim that equitable tolling applies, Plaintiffs cite *Irwin v. Department of Veteran Affairs*, 498 U.S. 89 (1990). In *Irwin*, the Court found that equitable tolling applies to suits against the Government under Title VII of the Civil Rights Act of 1964, but observed that "[f]ederal courts have typically extended equitable relief only sparingly." 498 U.S. at 96. Federal courts are divided as to whether the doctrine of equitable tolling or equitable estoppel applies to claims under the FTCA. *Compare Motley v. United* States 295 F.3d 820, 824 (8ᵗʰ Cir. 2002) (equitable tolling is applicable to FTCA claims against the government), and *S.R. v. United States*, 555 F.Supp.2d. 1350 (S.D. Fla. 2008) (FTCA's two-year limitations period was subject to equitable tolling), with *Marley v. United States*, 567 F.3d 1030, 1038 (9ᵗʰ Cir. 2009) (holding that § 2401(b) was jurisdictional and not subject to equitable tolling), and *Progressive American Ins. Co. v. United States*, No. 8:12-cv-1323-T-TGW, 2012 WL 6652843, at *5 (M.D. Fla. Dec. 21, 2012) (equitable tolling does not apply to FTCA claims). The Eleventh Circuit recently declined to decide whether the doctrine of equitable tolling is applicable to claims brought under the FTCA. *See Ramos v. United States Dep't of Health and Human Services*, 429 Fed. App'x 947 (11ᵗʰ Cir. 2011) (assuming, without deciding, that equitable tolling may apply to claims brought under the FTCA); *Chasteen v. United States*, 334 Fed. Appx. 271, 275 n.5 (11ᵗʰ Cir. 2009) (declining to address whether the FTCA allows equitable tolling).

### *Plaintiffs' Failure to Submit Evidence Demonstrating Jurisdiction*

The United States has presented substantial evidence demonstrating that Plaintiffs had, or should have had, knowledge of the murders, Wright's involvement in the murders, Wright's relationship with MacDill Air Force Base, and the government's actions or inactions more than two years before Plaintiffs filed their administrative claim. In contrast, the only evidence offered by Plaintiffs in support of their contention that the United States withheld the truth or misrepresented facts is the testimony of Sharon O'Connor and John Tuthill, Esq. from Wright's criminal trial. *See* Memorandum in Opposition (Dkt. 26), ¶ 2. This evidence, however, does not support Plaintiffs' contention.

Sharron O'Conor, who served as the enlisted liaison between the commander at MacDill Air Force Base and the enlisted members of the squadron, testified that she had received various communications from Paula O'Conner through the Red Cross, delivered a message from O'Conner to Wright, and spoke with O'Conner on the phone on one or more occasions. *See* Notice of Filing (Dkt. 27-1), Exhibit 1. John Tuthill, Esq. who was the lawyer originally retained by Paula O'Conner to file the paternity action against Wright, testified regarding Paula O'Conner's relationship with Wright, the paternity lawsuit, communications with the Air Force requesting "assistance" with respect to Wright, the events leading to the discovery of Paula and Alijah O'Conner's bodies, the handling of O'Conner's estate, the criminal investigation, and the Uniform Code of Military Justice's prohibition against adultery. *See* Notice of Filing (Dkt. 27-2), Exhibit 2. Neither witnesses' testimony indicates that the Air Force was attempting to deceive or mislead Plaintiffs.[23]

---

[23] Likewise, neither witnesses' testimony suggest that the Air Force acted negligently.

17

## Conclusion

Plaintiffs have failed to carry their burden of establishing by the preponderance of the evidence facts supporting federal subject matter jurisdiction. Indeed, the evidence demonstrates that there was sufficient information available to Plaintiffs to reveal a connection between the Air Force and the deaths of Paula and Alijah O'Conner more than two years before Plaintiffs filed their administrative claim. As a result, this Court lacks subject matter jurisdiction to consider Plaintiffs' claims.

Accordingly, it is **ORDERED AND ADJUDGED** that:

(1)    Defendant's Motion to Dismiss (Dkt. 20) is **GRANTED**.

(2)    Plaintiffs' Request for Oral Argument (Dkt. 28) is **DENIED**.

(3)    The First Amended Complaint for Wrongful Death Damages (Dkt. 16) is **DISMISSED** with prejudice. The Clerk is directed to **CLOSE** this case.

**DONE AND ORDERED** this _26th_ day of March, 2013.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

18